Good morning, Your Honors. I'm Renee Thorne. I represent the Sodexo defendants. I'd like to reserve two minutes for rebuttal, please. As you suggested, Judge Friedland, this is ERISA in Arbitration and Consent 2.0. I've listened very carefully to the judge's comments on consent. We have the same issue present in this case, as I'm sure you are aware. I'd like to make just a couple of quick comments, because I'm assuming you have lots of questions for me on other issues. So I would like to just start, though, with this. It sounds like it would go there, but in this case, I think there are individual claims. So if you disagree about that, please tell me why. But I think the questions I was asking in the other case don't apply here, because we definitely have at least some individual claims. Is that right? I would agree that the plaintiff has tried to bring a claim under Section A1B of ERISA, 502A1B, and that would be an individual claim. They also have brought A3 claims, but the A3 claims use the same language. The allegations are the same between the A3 claims and the A2 claims. But I would agree with my friend from Life Nation that A3 claims can be brought on an individualized basis. Here, because that is true, and because it appears that they brought the A3 claim by choice as an individual claim, I don't think there's any dispute that that claim is arbitrable under this arbitration agreement. It's an individual claim. If individual consent is not needed. Correct, but in this case, so why don't I address that issue here? It's different here than it is in the prior case. As you know, this is a health plan case and not a defined contribution plan case, as was the case in Life Nation. And in this case, we have a 502A2 claim, which would suggest, as we've been discussing, that's the plan's claim, and the plan's consent is the only thing that matters. And here, the plan consented. As for the individual claims, this plan has very specific language that says, and I'll read it to the court just in case. And certainly I'm not finding it in my notes. But it says that, oh, here we go, I'm sorry. The plan says that participants agree to accept the provisions of the plan as they are today or as they may be amended in the future. But the court in Monroe and Dorman suggested that, and in other Ninth Circuit cases, that plan participation is enough to consent. So here we have the act of participation, but we also have specific language that says you agree that this plan may be amended and you accept those terms. So this language you're pointing to, I believe I noticed it in a citation in your reply brief, but I did not see you make an argument anywhere really explicitly that the language of consent you were relying on was what you just said. Can you point to a place in your briefs, and or even in the district court, where the argument you just made is the argument you made about consent? As we stand here today, I am not going to remember if we did that elsewhere. But I did not find it in the district court or in your opening brief or any kind of express argument to that effect in your reply brief, although I thought you might make it as a citation. We did make it certainly in our reply brief. We raised it in response to the argument that the individual claims were different than the A2 claims, and we did point to that language in the record, if I am not mistaken, Your Honor. Maybe it's a sentence. It's not a very fleshed-out argument. I think it cites back. I agree that it is a reference to the language, Your Honor, and the language is contained in the record in the plan documents, which were made part of the record. And so I had understood you to be focusing a lot more on the receipt of something. I mean, this language was there in 2018, as I understand it, the language you just recited to us. But I thought your argument was all about whether you received this e-mail that was later and whether it was a fact mistake about the receipt of that e-mail and the other documents. But now you're going back to an entirely different point. Am I right? Well, yes and no, Your Honor. We were responding to the plaintiff's argument that they needed to consent and they had not consented and they were the ones relying on an e-mail which is not relevant in this context versus the e-mail that we actually did send to Mr. Platt. I think all of that is a red herring because we have consent here for all of these claims by virtue of the plan's consent on the A2 claim and Mr. Platt's participatory consent for the A1B and the A3 claim. And the participatory, so I think you need to have some warning as a participant that if you continue to participate, your participation will be read as consent. And the only way that you get there is this language you're quoting from the 2018 that you quoted to us today. The language is there, Your Honor, but to be clear, an e-mail was sent out to all plan participants when the arbitration language was added. That e-mail, if you don't click on the e-mail within 30 days or if you have otherwise not elected to receive electronic notices, then the summary of material modifications, which was 25 pages long, not 170 as the judge found, was mailed out. Mr. Platt was mailed a copy of the 25-page agreement. Can you point to anything in that communication that said, if you continue to participate in the plan, you have consented to arbitration? The SMM does not contain that language, Your Honor. The plan document and the SPD do. They say, if you continue to participate, can you point me to where? Or is that the same 2018 thing you just started with? It's the same language, Your Honor. It's always been in the plan. The language about if you consent to these terms as they exist or as they may be amended, that's always been in the plan. That's not new. So the plan was amended in 2021, but Mr. Platt changed his nicotine status back in 2018. So how can the amendment adding arbitration in 2021 affect his claim that would have started in 2018? Because plan amendments are generally considered to be retroactive, Your Honor. Based on what? Particularly in the health plan context. So, for instance, health plans get amended a lot because there are changes to coverages, there are changes to deductibles, there are changes to copays. No one could legitimately argue that if I have to change your copay today, that you are entitled to the copay that existed three or four years ago. But that's not what the argument is. His nicotine status changed in 2018. So his payment from that point on would change because of that. But the plan didn't include arbitration until 2021. So why would a claim from 2019 be subject to arbitration that didn't come into effect until 2021? Well, so if he had brought the claim before the arbitration agreement came into effect, then I can see where your point might be well taken, Your Honor. But the fact is, he brought this claim after the arbitration agreement was already in effect, and he is a plan participant. So in that way, it doesn't affect any of the other plans. Was it done at the time that his claim arose rather than the time that it was made? I don't think so in this context, Your Honor. Again, because particularly health plans, it's more fluid than that as a practical matter. These plans have to be amended. And, again, if we had a change in a deductible, for instance, or a change in a copay, the plan participant cannot say, you know, I want that copay, I want the copay I was paying five years ago because it was in effect five years ago. We have a right to unilaterally amend these plans. And I think Judge Griffin said that from RISA principle, I think, that you're talking about here. And that might be true. But where I think the argument gets a little difficult is when you are considering the overlay between the FAA and RISA. So the language that you're talking about in the plan document that's always been the same, the problem with sort of relying on that is that you're really not grappling with the overlay of the FAA, which doesn't allow those unilateral amendments to occur without there being consent. So I'm not quite understanding how even if we consider this argument, which may or may not be forfeited because it wasn't raised before, even if we were to consider it, I think it doesn't really address the FAA overlay. So I hear your point. We have other reasons why that A1B claim, I think the court is saying we agree that an A2 claim, the plan consented, if I'm hearing the court correctly. We have an A2 claim here. That's, frankly, a good portion of what this case is all about and what this argument is all about, and I do want to get to that. The A1B claim here was manufactured to try to plead around this arbitration agreement. It did not exist in the amended complaint, and the A1B claim would be a claim for benefits, and I think that's what you would be focusing on here, Your Honor, since we know that the A2 claim, or at least under this court's decision in Monroe, the A2 claim has a different construct for consent. So the A1B claim is different. It's an individual claim. There's no doubt about that in my mind. But it's a sham claim here, Your Honor. It hasn't been dismissed, and summary judgment wasn't granted. Well, no, Your Honor, saying it was a sham claim, because we're not allowed to get to that argument on the merits before we move to compel, which is an awkward construction, I agree. But we are certainly argued why the facts here show that the A1B claim is a sham claim. It was literally brought in an amended complaint only after Mr. Platt's counsel were notified of the existence of the arbitration agreement and its carve-out for claims for benefits under A1B. So I don't think it's a real claim in this case, which takes care of the court's concern over the consent issue. So let's say for purposes of argument that it's not a sham claim. So let's get to the consent issue then. So I believe that this court has already held that mere participation in a plan is consent. But only when you've been told that it will be. So that's where I'm getting back to whether this language, whether you've made an argument about any language that gave that warning. Well, we have certainly raised the argument in our reply brief. He was told about the — he always had access to the SPD, and under regular plan provisions when you join a plan, you get a copy of the SPD. He's never said — But that's the ER-221 language. Let me just confirm that we're on the same page literally, Your Honor. Are you referring to the language saying you agree to abide by the plan terms, Your Honor? The ones that can be amended in the future or as — As they are today or may be amended. And so I believe that that 221 language is in a document that was given in 2018. You represented a moment ago that it's in every document that they would receive. I'm not sure I see it anywhere else. So I'd be interested to know if you can point to it anywhere else. Your Honor, the plan documents that were submitted in this case were the plan documents during the relevant time period. So what you're saying that if you get — if a participant gets an email that says, or a document or a letter or something that says amendments have been made, and in that intervening period of time, a unilateral amendment was made to insert an arbitration provision, and the plan document always has language that says, you know, the plan as it exists today, before, or later, that together, even though you're never providing express information about the inclusion of an arbitration provision, that's enough? I'm not sure what Your Honor is referring to as express information about an arbitration agreement. In this case, he was provided with express information about an arbitration agreement. But can you point to any language in that communication, the one that told him now there's an arbitration agreement, that also said if you continue to participate? I see what you're asking now, Your Honor. No, there's more than one document for that argument. There's the plan document and the summary of material modifications, which went out at the time. So when a plan is amended, if it is a material modification of a plan, then there's an obligation to send out a notice. That's called — referred to as an SMM, a summary of material modifications. And it was the SMM that contained the arbitration agreement. Eventually, that language makes it into the plan document. They're just not required to send out an entire new plan document every time an amendment is made. They get to wait until the day meeting the plan sponsor can wait until the next cycle to formally include or incorporate that information in the plan document. Okay, so when the arbitration clause was sent, I think this is 2021? Yes. Where in the 2021 communication does it have any language that says if you continue to participate, you're agreeing to this? So if you got the email, there's an email that links the SMM, which does not have the language Your Honor is referring to, and the SPD, which does have the language Your Honor is referring to. Okay, but plaintiff says he didn't get the email, so then you go back to the mailing. So the mailing, he received a copy of the SMM. And here's the problem, Your Honor. These go out in bulk. So there is not a record other than they say anybody who didn't elect electronically will get it, and that's in the Carson Declaration. So I can't tell you what he saw or didn't say. He's saying he never got it. But he got a copy of the SMM, and the SMM also refers to the SPD, which has the language that you're concerned with. So you're saying the only way you get to 221 is by some sort of incorporation by reference. It didn't go out in the mail. It didn't go out in that mailing, Your Honor, with that SMM. So it seems very possible that there was no communication at the time that the arbitration clause was adopted that says if you continue to participate, you are agreeing to this. Other than the fact that the SMM specifically refers to the SPD, and that language has always been present in the SPD. And I will say, Your Honor, there's certainly no case law on this point requiring that when we add an arbitration agreement to a plan, that we also point you back to the language that says that you, by the way, agree to this arbitration addition. That sort of would defeat the notion that we have to get plan participant consent for every amendment that we make. We know, for instance, Your Honor, from the Supreme Court in the Himeshoff case, that we can add limitations periods. And there's no requirement for plan participant consent for that. We know that we can add choice of law provisions. We can add form selection clause. And no case has ever said that we need plan participant consent, I'm sorry, for those types of provisions. Those aren't governed under a separate federal statute like the FAA is. But the provisions to say that an arbitration provision in an ERISA plan should be treated differently than other provisions which the plan is allowed to add or amend. Doesn't Congress need to say that then? Doesn't there need to be some act by the legislature to say, we actually intend in ERISA for the FAA provisions not to govern with respect to the consent? Actually, I would say, Your Honor, in EPIC systems the court held the opposite. In EPIC systems the court was talking about the NLRA, Section 7 of the NLRA, and whether it prohibited a collective action waiver. And in that case the court said that it was the NLRA that had no mention that it was meant to override ERISA, that it had no mention that it was meant to, I'm sorry, that the NLRA had no provision in it saying that it was meant to override the FAA or that it was, any hint that it was meant to override the FAA. And they found that dispositive as to why the collective action. But it doesn't need, the FAA doesn't need to override ERISA in this context. What we have are two statutory schemes that we have to read together because neither one addresses the other in terms of which one trumps. I agree. And just to go back to a point, though, we're allowed to add all kinds of provisions like choice of law, like form selection, like limitations periods. The Supreme Court has specifically spoken to the ability to add a limitations period to a plan that does not require participant consent to do that. So to say that in order to add an arbitration agreement we need participant consent puts the arbitration agreement on unequal footing with all other contractual plan provisions. The Supreme Court has specifically said that that's verboten in the Concepcion case. But if you're adding arbitration and it's governed under another federal statute, the FAA, don't you have to comply with that federal statute? In this context, and I agree, there are no answers here yet, and I believe we do have to harmonize them. But we have to harmonize the FAA and ERISA also based on the practical considerations in how an ERISA plan has to be run. And as a practical matter, particularly in a health plan case, we cannot get plan participant consent every time we amend the plan. I see that I am way over my time, and we haven't had a chance to talk about effective vindication, and I don't know how you want to move on from here. Yeah, I think, well, I actually think why don't we give you two more minutes. I'll add five minutes on the other side, too, to make this fairer, because we do have a lot of issues that we need to resolve here that are novel. So can we just give her two minutes? Let me ask you, Your Honor, I have a lot to say about effective vindication, but you all have things maybe that you think are also present here. There were a lot of issues, so I'm happy to take questions on those as well. If not, I'd like to dive into effective vindication. I would like to hear your, in addition to effective vindication, your sort of response to our questions about unconscionability and what you think that unconscionability standard is under federal common law, or if we should be, you know, sort of. So we have this, the Ninth Circuit's decision in Noecker or Necker, I'm not sure how it's pronounced, that held that the plaintiff's unconscionability and public policy arguments are preempted by ERISA. That is the law of the Ninth Circuit. Now, that was not in the arbitration context, if I remember correctly, but we have several district court cases following Necker, including Robertson and our friends at Live Nation, and Cleveland v. Oracle, which followed Necker. In this case, if the question is, do I believe that, I do not believe that state law unconscionability arguments apply here because of the broad reach of ERISA's preemption provision. But wouldn't this be federal common law? I would agree, and I think in this way I may disagree with my friend at Live Nation, that if an unconscionability argument can be made, it would be made under federal common law. And what would the standard be under federal common law? That I'm not sure, Your Honor, to be honest. But what I can tell you is, again, because of the requirement of uniformity of administration of ERISA plans, which is a bedrock principle here, that that federal common law could not be guided as much by state law because then we would end up with the same problem that we have and why we have a preemption clause. We can't have plans subject to different state laws. But we could survey the states and choose the best rule as the federal common law, as long as it's a single one. As long as it's a single one and applied even-handedly and in the same manner across all states, I think that might work, Your Honor. And so do you disagree that we need to do that here? I do, actually, because I don't think there are valid unconscionability arguments here on the merits themselves. Okay, well, let's not get into that. We could remand that. But if we believe, it doesn't even sound like you've made an argument yet that that isn't available. So we have to figure out what the federal common law rule is, and we should send it back on remand to figure out unconscionability. I think you have to send this case back, Your Honor. And you're not disagreeing? Okay. Well, good. You think we should send this case back to see whether anything is unconscionable after articulating a federal common law standard? I think there are a number of reasons why this case should go back, Your Honor. It has to be reversed on the consent issue. It has to be reversed on the effective indication. I mean, the only thing the court got to was consent. It has to be reversed on consent. The plaintiffs have raised a number of other arguments, which the court did not get to. So to the extent that this court finds, for instance, that this is a legitimate effective indication argument. But when we affirm the district court with respect to the consent issue, my question really is do we still need to provide guidance with respect to the unconscionability? Yes, because the court didn't get to any of that, not just unconscionability. It did get to effective indication. It didn't get to whether the A1B is a legitimate claim or not. It didn't get to unconscionability. I mean, if we didn't address unconscionability at all in this case but addressed the standard in different cases, the district court would still have the benefit of that. Yes, Your Honor. I think I'm understanding that. I've already used up my two minutes. Again, the effective indication was such a big deal in terms of the briefing, obviously not in the district court. I would like to address that, but I also will sit down if you want me to. I think maybe we better have you sit down at this point. So I know it was supposed to be 10, but let's give 15 because of what I just did. And then we'll still give five minutes to the panel.  Good morning, Your Honors, and may it please the Court. My name is Alex Rickey on behalf of Mr. Platt. The plaintiff happily has three points that I want to address today, and I promise you that they are all guided by the extensive discussion that I have already heard thus far. My first point is that, to the questions that you were asking previously, Mr. Platt's consent was the only consent that mattered for the two claims under 502A3, which are for violation of 1182B, the nondiscrimination provision of ERISA. So that's Counts 1 and 2. And his consent was the only consent that was necessary for the violation of 502A1B, which is the claim for benefits, which is not a sham claim. I'm happy to address it if the Court has questions about it. My second point, I will keep it very brief because it was addressed extensively below, which is that it is Mr. Platt's position that on his breach of fiduciary duty claim, both his consent and the plaintiff's consent is necessary, consistent with the MICOR decision. But understand there was extensive discussion about that. And my third point is that if you agree with the first two, you can affirm completely. But third, even if you find that you need to reach effective indication on the breach of fiduciary duty claim, then we respectfully suggest that if you agree that the representative action waiver works a prospective waiver of statutory claims in violation of effective indication, the agreement collapses in on itself in terms of scope. And so there would be no point to send it back down. There's only one question. There's only one answer that can result from it. Well, I think we have lots of issues to talk about here, but maybe we start with the last one. I don't think there's been discussion about severability. So could you speak to whether we would have to figure out severability or whether that would need to be remanded? Because you might have an effective indication argument, but I think we'd have to look at severability, wouldn't we? So I appreciate you asking that question, Your Honor, because under LIM v. Deforce, severability is going to be reviewed under an abusive discretion. So you would be within your rights to send it back down to Judge Carter to make that assessment. But one of the last points that we made in our brief was that the agreement collapses in on itself if you find in our favor on effective indication, the point being that in terms of scope, here we have the first sentence of the arbitration provision says we agree to arbitrate. The plan agrees to arbitrate all claims under ERISA consistent with the AAA rules. The second sentence prohibits representative actions. And so if we agree that the breach of fiduciary duty claim is a representative action, we cannot now read back into the first sentence an agreement to arbitrate representative actions. So I think in that sense, there's only one result if you agree with us. I'm not sure I understand. Why not? Can you say that again? Sure. So this is a little bit attenuated in terms of what we're looking at here. But LIM v. Deforce looks back to Armendar as the California Supreme Court discussion on severability. And one of the key concepts that comes out of that is the question of whether you can reform an agreement. So if you strike a provision and it does not any longer encompass the scope of the dispute, the court cannot now reform it by adding terms into it to make it enforceable. And the point that I'm just making is a simple one, which is that if the plan purportedly agreed that you cannot arbitrate representative actions, and if a breach of fiduciary duty claim is a representative action that's unenforceable and you agree with that, violates effective indication doctrine, we cannot now read into sentence one of the agreement an agreement to arbitrate representative actions. That's the sole point that I'm making there. But otherwise, with respect to unconscionability. You're using California law for that, but wouldn't it be federal common law? Like maybe we would say under federal common law there's a presumption. I'm not saying we would do this, but just hypothetically, why couldn't we say under federal common law there's a presumption in favor of arbitration and we can say that the first sentence is what's left after we separate the improper part, which would mean every claim is arbitrated. I think that if you survey state law on this, which I assume would guide the court's analysis in developing a federal common law, you would see that courts are discouraged from adding terms post hoc into arbitration provisions to make them enforceable. If we thought that this issue needed to be decided, should we get supplemental briefing on that question? I don't think we have briefing on what the 50 states say about this or anything that we would need to decide that question. Should we decide it by getting more briefing on that or would we remand it? The severability analysis? I think given the abuse of discretion standard, the best course would probably be to remand the question to Judge Carter in the first instance to review simply the question of unconscionability and severability. I do think the court could reach effective indication, which may be consistent with what the Third Circuit did in the Henry case where the consent issue was framed and the court skipped over it and went straight to effective indication. Because you could make a finding on effective indication without deciding whether to sever it. But I do want to circle back to one point that I just think is crucial here, which is my first point, which is that, if there are no questions about this, I can quickly move on from it, but the claims that Mr. Platt owns, only his consent is necessary. It's actually the only consent that matters is his consent to arbitrate those claims. And I think that's entirely consistent with this court's Monroe decision in that Monroe v. USC case where, as we've talked about earlier, there's kind of this focus of. And so if we agree with you, I think the argument today is that the language in the 2018 document said, you forward-looking consent to everything we ever do in the future. And so why is that not consent? So, first, I think that that argument has actually been waived. I was surprised to see it in the reply brief. That was the first time that I had seen it. But, second, I don't think that that actually provides sufficient notice under this court's prior case law. If you look at the Jackson v. Amazon decision, which we cited in our papers, there is an extensive discussion about just sending out a notice and saying you're going to be bound by future terms isn't necessarily going to govern. And I think the same thing would apply here. And the other point on that is that we're reviewing Judge Carter's decision on that issue for clear error. And it's Sodexo's burden to show that there was an agreement to arbitrate. And we don't think that Sodexo carried that burden. Obviously, Judge Carter agreed with us. And I think that there's nothing that we can point to in Judge Carter's factual findings that rise to the level of pure implausibility and being completely illogical, which would be the standard under the POM 1. Why do you think it's a fact question? I mean, wouldn't it be a legal question whether something counts as consent? I mean, if we have this language and we have to figure out, is that kind of warning enough? Isn't that a legal question? That is a legal question if Sodexo carries its factual burden of evidencing it, which our contention is that they did not do that at the district court. Well, I think there was a dispute about whether you got the 2021 document, but I thought you got the 2022 document and also the 2018 document. Well, and I think this is part of the issue about why this is an undeveloped question. The 2018 document, the first discussion of any import of the 2018 document, as far as I'm aware, having been involved in this case from day one, was in their reply brief for the purposes that they were signing it for that. With respect to the other things, you know, the 2021 email, the only evidence in the record regarding that is Mr. Platt's statement that he went back and looked and he did not receive it. And then as the proponent of the arbitration provision, the alleged agreement, it would be Sodexo's burden to show that he did and they did not carry that. And then if you try to follow their reasoning, they say they had a corporate executive put into Dex and said, well, you know, we don't know specifically how he would have received it, but it was our practice that if they didn't click the link, then something would have been mailed to him. Mr. Platt says he has no recollection of receiving it. They have no evidence of sending it. And, in fact, the only evidence is that he says he did not receive the email and they did not provide evidence they sent it. So it doesn't really make sense to me to then give them the benefit of the doubt that, well, they don't have a record of sending him the email in question and he denies receiving it, but we're going to take them at their word that they had a system in place to mail him this other document that he claims he didn't receive it. So let's say that the language was included. Why do you think it's not sufficient notice? I think that you have to have informed consent. You know, if you look at Lance and basically every Supreme Court case that has addressed consent in the context of arbitration, they say it's strictly a matter of consent. Just by continuing to participate, even if you're sent a 180-page plan document that contains language on whatever page it is. I don't have it in front of me from 221ER. It says you may be bound by anything that we do in this plan document in the future. That's not sufficient under the FAA and under this Court's Jackson v. Amazon case to create a binding agreement to arbitrate absent something else. You know, I think Jackson was applying California law, maybe Washington law, state law. This would be federal common law. So do we have a federal common law rule on what kind of consent is needed to arbitration? Well, there is not a, I don't think, a federal common law rule, except that, as we've said, we look to state law on these issues. But I will say that in the Mull v. Merchant Ocean Pictures case that we cited in our papers, which is one of this Court's cases, there is a reference and citation to the Lim v. Teiforce case, which was decided under the framework of California law. And so, you know, I don't think it really makes sense to say that federal law, whichever it may be, is going to be wildly different from California state law. You know, consent is consent. And here, as a matter of fact, Judge Carter found that there was no consent based on evidentiary record. Is it your understanding that Judge Carter did not consider this language as they are today or as they may be amended in the future? I don't think he considered the language because they didn't raise it here. That's your argument, though, right, that you think it wasn't raised in the district court? That's my recollection. I don't remember having any argument on that below. But I think that we can assume that Judge Carter properly evaluated all the arguments that were raised and gave the factual propositions the weight that they deserved. I think he's owed that deference under the clear error standard. And lastly, Your Honor, I think when we talk about effective vindication, I'm going to strike that. When we talk about the 502A1B claim, I think I would be remiss if I didn't mention this. The question, obviously, of whether or not it states a claim is something for the district court to decide. We think that it plainly does under the Forsyth v. Cubana case that we cite in our papers, which stands for the proposition that if you overpay for care or premiums or co-pays in violation of the plan documents, then you have a claim under 502A1B. That's what we've alleged here. We alleged it when we did, in the first minute complaint, after we received the plan documents from the defendant in this case. But I do want to note that under the terms of the plan's arbitration provision itself, that claim is carved out from the arbitration provision. So there's really no legitimate argument that that claim should be compelled into arbitration beyond the defendant's position that they're raising. So could I just try to give an outline of what's going on here? So your primary argument is that the individual claims is lack of consent. Correct. But you also have claims on behalf of the plan, or at least a claim on behalf of the plan. And we haven't talked about that, I don't think, at all yet with you. So for the claim on behalf of the plan, I think the argument on the other side anyway is all that matters for the consent is the plan's consent. Do you have an argument against that that you want to mention before you sit down? Yeah. The argument against that is going to be similar to what we heard from the Havasia case, which is that the only way that we view that you can read Comer v. Mycor and Agro versus USC in harmony is to see that the participant's consent and the plan's consent is necessary. So if we disagree with you, though, that's when we're going to get to the vindication and the unconscionability as to the claim for the plan, as to the arbitration issue of the claim against the plan. That's correct. I would make one quick note on that that I think dovetails nicely with something that Your Honor had said earlier, which is that I think the idea that those claims are exclusively brought on behalf of the plan and that only the plan's consent matters and the participant's consent doesn't matter, and that somehow there's an important distinction between it being in a services agreement with an investment advisor and the plan document, I think goes back to the original question, which is finding that ERISA somehow preempts the FAA on contract formation. Because if it's true that what was said in Comer, that the claim really does, the cause of action belongs to the participant while the relief belongs to the plan, then I think it does follow that the participant's consent is necessary. And I think the only way that you can get around that and draw a distinction between Comer and it being in a plan document versus in some other collateral document that provides the plan's consent is to say, is to kind of endorse the idea that, well, the participant is bound somehow under the FAA, under the plan document. And I think that that's not consistent with this court's case law. We would ask that Your Honors affirm in total, and I appreciate the opportunity to be here. Thank you very much. Let's hear from the government. Please place the court. My name is Alyssa George. I represent the Secretary of Labor as amicus in support of Plaintiff Appellee. And as reference, I'm here to discuss the effective indication doctrine, which, to be clear, applies only to the 502A2 claim that Plaintiff has brought. And just to sharpen the question before the panel on this issue, the question is whether courts must enforce a provision in an arbitration agreement in a RISA-covered plan that bars participants from bringing a representative proceeding that requires them to assert claims only in their individual capacity. This court should join the five other circuits that have looked at this issue and found that arbitration provisions are unenforceable when they would deny participants the rights and remedies provided in a RISA. So just briefly, the court has already, I think, heard a bit about the nature of the claim under Section 502A2. And we would fully agree that the claim is inherently a representative claim that is brought on behalf of the plan. There is no individual claim available under Section 502A2. And, in fact, appellants agree with that point, at least thus far, as for their consent argument, noting in their brief that A2 claims belong to the plan, not the participant. And so the representative action waiver here directly bars participants from asserting that claim in arbitration. The Supreme Court has held that an arbitration agreement cannot alter or abridge substantive rights. And it has held that the representative action is a matter of substance and not procedure. And so putting those together, the arbitration provision here bars... Can you just help me with where you think they held that it's a matter of substance? Because I think I looked at the site in your brief and didn't quite think that it said what you were saying. What are you relying on for that? Sure. So largely Viking River, that's the most recent Supreme Court case on this issue. And there, that's not a RISA case. But it discusses in quite a lot of detail the distinctions between a representative action, on one hand, which is brought by a single agent on behalf of a single principal, and compare that and contrast that to a claim joiner or a class action procedure where one individual litigant can bring together, can aggregate together other individual claims procedurally for purposes of litigation. But a representative claim where, again, it's a single agent, single principal claim, and the Court of Viking River said that that representative action is a matter of substantive rather than procedural law. And the other way you can... Do you know what page reference you're using for that? Yes, that's 656 of Viking River, 596 U.S. at 656, explaining that the non-class representative action is part of substantive law. And then it goes on to give examples that are helpful here. One of those examples is a trustee action. And that, I think, is quite analogous to the A2 claim under RISA, which authorizes a participant in the same manner as it authorizes a fiduciary or the secretary to bring a representative action on behalf of the plan to redress harm to the plan. I'd like to speak briefly about appellants' reading of the provision, which, again, they on the one hand seem to concede that an A2 claim belongs to the plan, but they also argue as an effective indication issue that plaintiff could somehow still bring an A2 claim on an individualized basis and seek individualized recovery. And, again, we don't believe that's the case based on the nature of the claim being inherently representative. But even if we take that as true, then the provision would operate exactly the same as the provisions at issue in the other five circuit cases where there were explicit restrictions on the remedies available to the participant. And so in an appellant's reading, this provision operates in exactly the same way and cuts off the plan-wide remedies that are available under 409 and 502A2, and would limit that claim into only its individual or some sort of individual recovery. And then finally, just a brief note on Dormant 2, which appellants have relied on to support the idea of an individualized arbitration. So first, Dormant 2, if it's relevant at all, is relevant only to defined contribution plans, which is not the issue here. But we would also suggest that Dormant and the way that Dormant read LaRue to support the idea of an individualized arbitration proceeding involving A2 claims is incorrect, and this Court's decision in Monroe is a much better reading of LaRue. So if we agree with you that the effective vindication argument prohibits this ban on the representative action, it seems like you think we need to look at severability, though. So the Secretary's not taking a position on severability or the other mechanics of the provision. I know you're not taking a position on whether it's severable, but are you taking a position that we need to think about whether it's severable? I mean, I think the Court would need to make some sort of decision as to how to move forward with where the matter would proceed, of course. So, sorry, I know you don't want to tell us whether it is severable. Right. But do we need to ask whether it's severable, or you don't want to tell us the answer to that either? I think the only point I'm authorized to make is that this provision, the representative action waiver, cannot be enforced. And beyond that, I will leave it to the other parties to address. Thank you. Thank you. I've lost track of how much time we have left, but let's put three minutes on the clock. I think we don't have any time left, so let's put three minutes on the clock. We'll do three. I'm going to speak very quickly, despite my Southern upbringing, because I want to hit these very important points on effective vindication. Really important here. In Monroe, the court made clear that you don't even get to an effective vindication argument unless you demonstrate a conflict between two federal statutes. But the amici and Mr. Platt have insisted they are not arguing a conflict. So we don't even talk about effective vindication, point one, but since we are. To try to meet their burden, Mr. Platt and the amici rely heavily on this quintet of cases from other circuits, all finding that in the A2 context, an effective vindication, the effective vindication doctrine means you can't have a waiver of a representative action. But then when they get to Dorman, and I'm sorry, let me step back. All of those cases, every single one of them, was in the defined contribution context. When they get to Dorman 2, which was also in the defined contribution context, because it does not help them, they suddenly say Dorman 2 doesn't apply. Well, Dorman 2 is not published, so at least in my view, we act as if it doesn't exist. Fair enough. I'm just responding to their point that it doesn't apply because the difference here is that this is a health plan. Well, if that's the distinction that needs to be drawn, then that quintet of cases from other circuits falls away because they are all in the defined contribution context, and this is a health plan. So we can't have it both ways, Your Honor. I'm sorry. So I'm going to ask you to answer this question without talking about Dorman 2. So why would effective vindication not apply to a health plan? Well, this is what they're arguing, Your Honor. They're arguing that a defined contribution context case should not apply here because this is a health plan case. Okay, I'm going to ignore what she said about Dorman 2, and I'm going to ignore what you said about Dorman 2. So just give me an argument, whatever you want to say, about why effective vindication shouldn't be considered here that doesn't talk about Dorman 2. I think it's not so much that effective vindication doesn't apply as the cases that are being relied upon don't apply because they are all outside of the health plan context. And why should that matter? Because in the D.C. plan, the defined contribution context, you have individual accounts, and that's what LaRue was all about. The case which the amici and Flatt relied so heavily on, the Supreme Court's case in LaRue v. DeWolf, was in the defined contribution context. But aren't we talking about representative actions? We're not talking about individual claims. We're talking about on behalf of the plan claims. Right, but they analogize to LaRue and say that the Supreme Court in LaRue and in Russell made reference to claims on behalf of the plan for an A2 claim. But to be sure, the LaRue case was about someone who was bringing an individual claim. And the issue in LaRue was whether an individual claim for damage to an individual account in a 401k plan could be brought under 502A2. And the court held that it could. So if you look at LaRue, what it really stands for, and this is what Dorman 2 said, which is you can bring an individualized claim under 502A2. Importantly here, Your Honor, the amici and Mr. Flatt relied so heavily on LaRue and also Russell. Russell is a much older Supreme Court case in the defined benefit context. And in that case, the issue was not whether you can waive a representative action, nor was that issue present in LaRue. The issue in Russell was only whether extracontractual damages were available under ERISA in an A2 claim. And the court held that they were not. The court correctly held that. But I think the Sidaniuk dissent in this case, which is one of the quintet, actually makes an extremely important point. And that is the Supreme Court's most recent pronouncement on Section 502A2 comes in the Thole v. U.S. Bank case. And in that case, and if you don't mind, I'm going to quote the language to you. I think we're over time, so I think you've named the case and we can read it. We don't need you to read it to us. I think you should wrap up if you could. Thank you, Your Honor. So we'd ask the court to reverse and revamp. Thank you. Thank you, everyone, for the helpful arguments. This case is submitted, and we are adjourned for the day. All rise. Thank you.
judges: FRIEDLAND, DESAI, Schreier